**T.W., a minor, by Tracy M. Wilson, his**
**next friend, mother and natural**
**guardian,**

**Plaintiff,**

**-vs-**                                               Case No.  6:07-cv-155-Orl-28GJK

**THE SCHOOL BOARD OF SEMINOLE**
**COUNTY, FLORIDA, and KATHLEEN**
**MARY GARRETT,**

**Defendants.**
_____

# ORDER

Kathleen Garrett ("Garrett") was tried in state court on charges of abusing autistic students in her middle school class.[1]  In the instant civil action,[2] one of her former students, T.W., asserts a claim against Garrett under 42 U.S.C. § 1983 (Count IV), alleging that Garrett deprived him of his "constitutional civil rights and his Fourteenth Amendment due process liberty interest." (Compl., Doc. 1, at 15).  Additionally, T.W. asserts claims against the School Board of Seminole County (the "School Board"), alleging three counts: § 1983 (Count I); § 504 of the Federal Rehabilitation Act of 1973 (Count II); and a state-law claim

---

[1]During the state criminal proceedings, Garrett faced three counts of child abuse and one count of aggravated child abuse.  The state court entered judgments of acquittal on two counts; the jury acquitted her of one of the remaining counts and found her guilty of the other.

[2]Fourteen companion cases have been filed in this Court arising from essentially the same operative facts.

for negligence in hiring, supervision, and retention (Count III).  (Id. at 10-11, 13).  Before the

Court is Garrett's Motion for Summary Judgment (Doc. 88) and the School Board's Motion

for Summary Judgment (Doc. 83).

## I.  Background

T.W. was born in Maryland on December 5, 1989 and lived there until the spring of

2004 when he and his mother, Tracy Wilson ("Wilson"), moved to Florida.[3]  (Doc. 135 at 5).

Beginning in April 2004, T.W. enrolled as a special education student at South Seminole

Middle School and spent approximately four months in Garrett's class at South

Seminole—the final days of the 2003/2004 school year and the early portion of his eighth

grade year—until October 25, 2004, the date of Garrett's removal from the classroom.

Wilson first noticed that T.W. was not developing properly when he was approximately

three years old because of the effect that loud noises had on him.  (Wilson Dep. at 24).  A

speech and language assessment conducted at the Kennedy Krieger Institute in December

1994 indicated that T.W. demonstrated "significant speech and language deficits."  (Ex. 1 to

Nusz Dep., at 2).  In 1997, T.W.'s elementary school reevaluated him and identified T.W. as

suffering from an emotional disturbance based upon his aggression towards family

members, antagonism towards his peers, and complex fantasies.  (Id.).  In March 2000,

T.W.'s diagnosis was changed to autism after another psychological evaluation was

completed at Sandy Plains Elementary School.  (Id.).  T.W. was diagnosed with Pervasive

_____

[3]Prior to moving to Florida, T.W. had been abused by his birth father, had been
abused both verbally and physically by his stepfather, had witnessed his stepfather abusing
his mother, and had been diagnosed with Post Traumatic Stress Disorder.  (Wilson Dep. at
11-12, 16, 88).

Development Disorder–Not Otherwise Specified ("PDD-NOS") at the time he enrolled at South Seminole. (Wilson Dep. at 119). However, T.W. is currently not classified as autistic but rather as having a "mood disorder." (Id.).

Despite his developmental disabilities, T.W. was a highly verbal child. His mother described him as very verbal with an extensive vocabulary. (Id. at 25, 29). An aide who worked with T.W. described him as very verbal, that he "can talk to you," and that he is able to respond to questions "depending on his frame of mind." (Mort Dep. Nov. 4, 2004 at 22). During his enrollment at South Seminole, T.W. exhibited significant behavioral problems while in Garrett's classroom.[4] He would become agitated and aggressive when told to complete a task which he did not wish to do, causing him to throw things and punch tables. (Mort Dep. July 25, 2007 at 83-84)[5]. This behavior would continue when he was placed in the cool down room, where he would throw furniture around until he calmed down. (Id.). T.W. would get into trouble weekly and call Garrett names during class, often referring to her as a "bitch." (Id. 81-82).

Wilson alleges that T.W. was subjected to physical and emotional abuse at the hands of Garrett, resulting in long-term emotional and psychological harm. It is also alleged that T.W. witnessed the severe conduct that Garrett directed towards his fellow classmates, much of which has been documented elsewhere. See J.V. ex rel. L.O. v. Seminole County

---

[4]T.W. spent approximately half of the school day in Garrett's class and the other half with another teacher.

[5]Plaintiff submitted one interview and six depositions of Mort to support her opposition to Garrett's Motion for Summary Judgment.

Sch. Bd., No. 6:04-cv-1889, Doc. 164 (M.D. Fla. filed Mar. 21, 2007). In support of the allegations of abuse, Wilson offers the deposition testimony of Sabrina Mort ("Mort") and Jennifer Rodriguez ("Rodriguez")—teacher's aides who worked in Garrett's classroom at the time—as eyewitnesses of the abuse directed at T.W. Mort and Rodriguez describe Garrett's use of profanity and detail several incidences during T.W.'s time at South Seminole where they felt that Garrett either inappropriately restrained or physically abused T.W.[6]

Wilson asserts that Garrett verbally abused T.W. throughout his time at South Seminole, offering the deposition testimony of Mort and Rodriguez as evidence of this abuse. Garrett would call T.W. an "asshole," a "jerk," and a "pig" as well as telling him that he was "stupid" and "stinky." (Mort Dep. July 25, 2007 at 60). This verbal abuse was directed at T.W. approximately two to three times per month. (Id.). Garrett also used the word "fuck" around T.W. often, (id.), but Garrett directed this term at T.W. specifically on only two or three occasions, (id. at 139).[7] Both Mort and Rodriguez claim that Garrett regularly used

---

[6]Mort and Rodriguez also stated that several times they witnessed Garrett inappropriately place T.W. in the "cool down room"—a bathroom connected to the classroom; students were placed there so that they would not further disturb the other students in the classroom. This Court, however, has previously held that, though not optimal, the use of a bathroom as a cool down location for timeouts is not unconstitutional. See J.A. ex rel. Abelove v. Seminole County Sch. Bd., No. 6:05-cv-975 (M.D. Fla. Apr. 19, 2007) (Doc. 134, order granting motion for summary judgment). Though the Complaint alleges that T.W. was locked in the cool down room for the entire day on at least ten occasions, the record evidence does not support this allegation and the Court will not revisit its previous holding that the use of the cool down room is not unconstitutional.

[7]Mort also states that she heard Garrett call T.W.'s mother a "bitch," belittle her for receiving either social security or food stamps, and tell her that she only kept T.W. with her so that she could continue to receive these benefits. (Mort Dep. July 25, 2007 at 59-60). There is no evidence, however, that any of this was said in front of T.W. Accordingly, the Court will not consider this as evidence of verbal abuse of T.W..

profanity in general in the classroom around the children.

Wilson alleges that, in addition to suffering this verbal abuse, T.W. was physically abused during his time at South Seminole. The first incident of physical abuse occurred during the final days of the 2003/2004 school year after an argument between T.W. and Garrett.[8] Because of the ongoing argument, Garrett requested that T.W. go to the cool down room, but T.W. became very agitated and began screaming at Garrett that he was going to "have her arrested" and called her "Michael Jackson," a "pervert," and a "child molester."[9] (Id. at 111-12). In response to T.W.'s outbursts and subsequent refusal to go to the cool down room, Garrett restrained T.W. by taking him down to the ground, straddling his buttocks and legs, and pulling his arms behind his back. (Id. at 68, 72-73). Garrett then informed T.W. that she would release him when he agreed to follow her commands in the classroom.[10] (Id. at 68, 73). After his restraint, T.W. continued to scream threats at Garrett until he calmed down. (Id. at 68). The entire incident lasted less than five minutes, and T.W.

_____

T.W.'s mother also claims that T.W. told her that Garrett referred to her as a "slut" and a "bitch." (Wilson Dep. at 52). Additionally, T.W.'s mother states that T.W. told her that Garrett threatened to break his fingers and to kill his mother if he did not behave or told on Garrett. (Id. at 100-01). This is inadmissible hearsay evidence and may not be considered on a motion for summary judgment. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999).

[8]Though Rodriguez states in her deposition that she believed that Garrett provoked the incident based upon the content of the conversation, she admits that she does not actually know what initiated the argument. (Rodriguez Dep. July 31, 2007 at 68-69).

[9]T.W. had previously threatened to make false allegations of staff abuse while in Maryland. (Ex. 3 to Nusz Dep., at 1).

[10]Rodriquez states that Garrett used profanity during this portion of the incident with T.W., but she does not remember what was said. (Rodriguez Dep. July 31, 2007 at 71).

suffered no physical injury as a result of the restraint.[11]  (Id. at 74, 83).

The second incident occurred during the 2004/2005 school year.[12]  After entering the

_____

[11]Rodriguez adds that Garrett restrained T.W. another time by placing his hands behind his back and guided him to the cool down room, though she also admits that she does not know what precipitated the event.  (Rodriguez Dep. July 31, 2007 at 76-77).

[12]It appears from the record that Mort gives two variations of how the incident involving the bug bite unfolded.  On November 4, 2004, John Byerly—an investigator for the School Board—conducted an interview of Mort wherein she details the bug bite incident.  (See Mort Interview, Ex. 2 to Doc. 112).  Because on summary judgment the Court views the facts in the light most favorable to the nonmoving party, the Court proceeds with its analysis under the story discussed in the body of the opinion—a story more favorable to T.W.'s claim—rather than the alternative version detailed below.

Mort states in this interview that T.W. was taken to the clinic during the class prior to Garrett's and received an ice pack because the bite was starting to swell from his repeated scratching.  (Id. at 14).  Immediately upon entering Garrett's classroom, T.W. continued to scratch the area.  Garrett told T.W. to stop scratching and complete his task, causing T.W. to become defiant and refuse to return to his work.  (Id. at 15).  In response to T.W.'s resistence, Garrett "walked over to [T.W.], picked him up off his feet[,] and laid him down on the table."  (Id.).  Mort states that Garrett then restrained T.W. by pushing him face down on the table with one hand on the back of his shoulders and one hand pulling T.W.'s arm behind his back.  (Id. at 16).  Because of a medical problem with her arm, Garrett released T.W. after restraining him for approximately four minutes and directed him to begin working.  (Id. at 17).  T.W. then became even more agitated, crawled under the desk, and began growling and spitting at Garrett.  (Id. at 16-17).  This behavior led to Garrett calling in Vice Principal Augusto, who took T.W. to the cool down room.  (Id. at 18).  T.W. then calmed down and returned to his desk.  After his return, Garrett began telling T.W. to finish his work, which he again refused to do.  (Id.).  Accordingly, Garrett sent T.W. back to the cool down room and shut the door, apparently without entering the cool down area with him.  (Id.).  T.W. became "very mad" and began "slamming the table and banging the chairs into the table."  (Id.).  Garrett responded by taking T.W. out of cool down and back to his desk, where T.W. immediately crawled under the desk and began growling, hissing, cursing at Garrett with "very, very, foul language," calling her a "bitch" and "pervert," and telling Garrett that she had "no right to touch me like that, you're only supposed to be taking me down."  (Id. at 18-19).  After being unable to remove T.W. from underneath the table, Augusto was called back and took T.W. out into the hall to calm him down.  (Id. at 19).

Mort asserts that Garrett originally restrained T.W. "because he defied what she told him to do," (id. at 16) and states that Garrett "irritated him until he got to that point where he just couldn't . . . handle it anymore," (id. at 19).

classroom, Garrett noticed that T.W.—who has a history of scratching himself until he bleeds[13]—was continuously scratching at himself, presumably over some sort of insect or mosquito bite.[14] (Id. at 74, 78). Mort described T.W.'s conduct by saying that "he kept just digging and digging at it, scratching and scratching at it, and he wouldn't stop." (Mort Dep. May 10, 2006 at 46). Garrett told T.W. to stop scratching himself and return to his work, but he instead continued this behavior. (Id. at 78). At this point, Garrett approached T.W. and pushed his arms down to stop his scratching, causing T.W. to begin "screaming and hollering and cussing." (Id.). Garrett then "picked him up out of the chair and laid him across the table and laid down over him to stop him from [scratching]."[15] (Id. at 78-79). Garrett then escorted him to the cool down room and told T.W. that when he calmed down he could return to his seat. (Id. at 79). Garrett placed T.W. at the desk in the cool down room, shutting the door as she returned to the classroom. (Mort Dep. Jan. 11, 2005 at 40). T.W. began screaming in the cool down room, so Garrett entered the cool down room and shut

_____

[13]While still in school in Baltimore, T.W. would scratch his head until it bled. (Ex. 1 to Nusz Dep. at 3; Mort Dep. May 10, 2006 at 78).

[14]Mort states that T.W. was scratching at a bite on his cheek, (Mort Dep. May 10, 2006 at 45), while Rodriguez states that T.W. was scratching at a bite on his arm, (Rodriguez Dep. at 74). Regardless, the record is clear that T.W. was scratching himself; the location of the itch is unimportant for summary judgment purposes, especially in light of T.W.'s history of self-injurious behavior, (see Mort Dep. May 10, 2006 at 78).

[15]Mort testified that she believed that Garrett's restraint of T.W. was not inappropriate in this incident but felt that Garrett was too forceful when pulling T.W. from his seat prior to the restraint. (Mort Dep. July 25, 2007 at 23). Mort felt Garrett's actions were inappropriate because she did not pull his chair back from the table before restraining him, causing him to hit his legs on the edge of the table. (Id. at 120).

the door behind her.[16]  (Id.).  Mort then heard furniture slamming and T.W. screaming for

Garrett to stop and that she was hurting him.  (Mort Dep. July 25, 2007 at 88).  After about

five minutes, T.W. and Garrett exited the bathroom; T.W.'s hair was disheveled.  (Id. at 89).

T.W. then returned to his desk, called Garrett a "pervert,"[17] and "just chilled out," working

slowly until the end of the school day.  (Id. at 89, 154).  The next morning T.W. returned to

school with a note from his mother questioning why Garrett had twisted her son's arm and

shoved him against the wall in the cool down room.[18]  (Mort Dep. Jan. 11, 2005 at 42).

_____

[16]In her initial interview on November 4, 2004, Mort did not say that Garrett entered
the bathroom with T.W.  (Mort Interview, Ex. 2 to Doc. 112 at 18).  Instead, Mort stated that
Garrett sent T.W. into the cool down room where "he started [to] get very mad and slamming
the table and banging the chairs into the table."  (Id.).  In response to this, Garrett removed
T.W. from the cool down and returned him to his desk, where he began the conduct
previously discussed which necessitated Augusto's second visit.

[17]Though Rodriguez was present in the classroom at the time of this incident, she did
not mention in her deposition that T.W. called Garrett a "pervert" during this incident.

[18]Though never raised by T.W. or his mother in their Complaint or in subsequent
depositions, counsel for T.W. now attempts to avoid summary judgment by alleging that a
question of fact exists as to whether T.W. was sexually abused by Garrett in light of the
"pervert" comment made when exiting the cool down room, T.W.'s disheveled hair, Garrett's
invocation of the Fifth Amendment during deposition questioning when asked whether she
had touched T.W. in a sexual manner while in the cool down room, and the report of Rosario
Upchurch ("Upchurch"), a psychologist retained by T.W. who specializes in clinical and
teaching skills in marriage and family therapy.  (Doc. 113 at 16).  Upchurch opines in her
report that T.W. may have been a "victim of sexual inappropriateness at the hands of Ms.
Garrett."  (Upchurch Report at 10, Ex. B to Upchurch Aff.; Ex. 1 to Doc. 145).  Upchurch
based this opinion on the fact that "during therapy, and at home, [T.W.] was triggered and
exhibited an emotional reaction to being in close proximity to others."  (Id.).  She then stated
that "[T.W.'s] emotional plate was full and he was clinically too fragile to delve into this
overwhelming possibility."  (Id.).  Counsel has presented no evidence that any sexual abuse
occurred, instead relying on "an informed guess" by Upchurch that sexual abuse may have
occurred, (Upchurch Dep. at 158) and a request that the Court draw an adverse inference
from Garrett's assertion of her Fifth Amendment right, (Doc. 113 at 16).

However, in light of T.W.'s prior history of calling Garrett a "pervert" when she clearly

Another incident occurred when T.W. left his desk after being told by Garrett to do his work. (Mort Dep. July 25, 2006 at 121-22). As Garrett approached T.W., he "turned around and swung at her" and kept "swinging with his hands" at her until she "took him down on the floor." (Id. at 122). Garrett then restrained T.W. on the floor by grabbing his right ankle and pulling it up to the back of his left leg, a method of restraint deemed inappropriate by Mort. (Id.). Garrett held him in this manner for approximately two to three minutes until he calmed down, at which point she released T.W. and he returned to work at his desk. (Id. at 122-23). Mort also claims that Garrett once attempted to trip T.W. as he exited the cool down room, causing T.W. to stumble but not fall.[19] (Id. at 127).

Wilson claims that Garrett's treatment of T.W. and his classmates amounted to physical, emotional, and psychological abuse. Wilson alleges that T.W. suffered bruises on his arms on two occasions. (Wilson Dep. at 59-61). However, Wilson never sought medical treatment for T.W. concerning the bruising. (Id. at 110). Wilson contends that Garrett's

---

had not sexually abused him during the first episode of restraint reported by Rodriguez, his prior threats to make false allegations, the absence of any allegations of sexual abuse in the Complaint, evidence that T.W. reported the incident to his mother without relating any inappropriate touching despite a clear ability to convey such information, and an absence of any such confirmation in Rodriguez's deposition despite her presence in the classroom at the time, the Court finds that no question of fact exists as to whether Garrett sexually abused T.W.

[19]Mort testified that when she entered the room T.W. was already in the cool down room with the lights turned off and Garrett was sitting in front of the door. (Mort Dep. July 25, 2007 at 127). After approximately four to five minutes, Garrett opened the door to let T.W. exit. (Id.). Mort then clarifies that she cannot be sure that Garrett attempted to trip T.W. or if she just happened to be turning around in her chair at that time. (Id. at 128). The alleged intentional tripping incident is contained in only one of the six depositions provided by Mort relating to the Garrett cases.

actions caused, in addition to the bruising, behavioral changes in T.W., including difficulty sleeping, an unwillingness to go to school, crying on the way to and from school, "urinating all over the place," an inability to close bathroom doors, stress, panic attacks, and trust issues which eventually led to T.W.'s dropping out of high school. (Id. at 78, 140). Wilson attributes these behavioral changes to the events which occurred in Garrett's classroom.

Deborah O. Day, a psychologist retained by Wilson, states that T.W.'s refusal to continue school "can be directly traced back to his experiences with Ms. Garrett." (Day Report at 11, Ex. 2 to Doc. 107). Additionally, Day opines that "Ms. Garrett aggravated [T.W.'s] developmental disability, increasing his anger[ ] and decreasing his adaptive functioning." (Id.). She also notes that "[T.W.] has learned to run from teachers and to attack school administrators when they try to direct him."[20] (Id.).

In addition to making claims against Garrett, T.W.'s mother contends that the School Board had actual or constructive knowledge of Garrett's propensity to use excessive force because there were complaints of abuse against her at Indian Trails—the school at which she taught before being transferred to South Seminole[21]—and at South Seminole. Thus, T.W.'s mother argues that the School Board was on notice of the risk that Garrett posed to

---

[20]Though not stated directly in her report, the Court assumes that Day is expressing the opinion that T.W. learned this behavior as a result of his interaction with Garrett. If this is indeed Day's intended statement, such an opinion is problematic in light of T.W.'s prior history at Dundalk Middle School in Baltimore, where it was documented that T.W exhibited aggression towards himself and others, kicked his personal assistant, threaten to blow up the school and make false allegations concerning the school staff, and required numerous physical restraints. (Ex. 3 to Nusz Dep. at 1).

[21] Details of Garrett's teaching at Indian Trails Middle School and the allegations made there are set forth in J.V. at Docket Number 166.

students, the disregard of which equates to reckless and deliberate indifference to T.W.'s substantive due process rights. Wilson also contends that by failing to protect him from Garrett's abuse, the School Board intentionally discriminated against T.W. because of his disability by failing to accommodate his vulnerable condition.

## II. Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "A nonmoving party, opposing a motion for summary judgment supported by affidavits [or other relevant evidence] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e)(2) (providing that the nonmovant "must . . . set out specific facts showing a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### III.  Garrett's Motion for Summary Judgment

Plaintiff's substantive due process claim arises from: (1) verbal abuse from Garrett's use of foul and belittling language directed at T.W.; (2) physical abuse in Garrett's use of excessive force when restraining T.W.; and (3) psychological and emotional abuse from witnessing Garrett's actions of verbal and physical abuse of other students. The Fourteenth Amendment's substantive due process right protects persons from the arbitrary exercise of governmental power. Daniels v. Williams, 474 U.S. 327, 331 (1986). Embodied in this right is the right to be free from excessive force at the hands of a government official. Dockery v. Barnett, 167 F. Supp. 2d 597, 602 (S.D.N.Y. 2001). Substantive due process reflects "the right to be free of state intrusion into realms of . . . bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court." Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980). To succeed in establishing a § 1983 claim, T.W. must demonstrate an injury amounting to a deprivation of his constitutional rights; it must be an injury that literally shocks the conscience of the Court.

Though the Court does not condone the verbal abuse directed at T.W., Garrett cannot be subjected to § 1983 liability for such acts. Viewing the evidence in the light most favorable to T.W., Garrett clearly used language inappropriate for a classroom setting and

offensive to this Court.  This use of foul and belittling language, however, does not amount to a violation of T.W.'s constitutional rights.  Simply put, "[v]erbal abuse is normally not a constitutional violation."  Doe v. Gooden, 214 F.3d 952, 955 (8th Cir. 2000).

Physical abuse, however, may rise to the level of a deprivation of a constitutional right.[22]  The Eleventh Circuit, in addressing corporal punishment in the school setting, has held that "excessive corporal punishment, at least where not administered in conformity with a valid school policy authorizing corporal punishment . . ., may be actionable under the Due Process Clause when it is tantamount to arbitrary, egregious, and conscience-shocking behavior."  Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1075 (11th Cir. 2000).  "A plaintiff must prove at a minimum that '(1) a school official intentionally used an amount of force that was obviously excessive under the circumstances, and (2) the force used presented a reasonably foreseeable risk of serious bodily injury.'"  Peterson v. Baker, 504 F.3d 1331, 1337 (11th Cir. 2007) (quoting Neal, 229 F.3d at 1075).  In order to determine whether the amount of force used was obviously excessive, a court considers the totality of the circumstances, paying particular attention to the following factors: (1) the need for the application of corporal punishment; (2) the relationship between the need and amount of punishment administered; and (3) the extent of the injury inflicted.  Id.  When conducting this analysis, the Court remains mindful of T.W.'s developmental disabilities.

The conscience-shocking threshold is more quickly reached in cases where the victim

_____

[22]Regardless of whether T.W.'s claims arise from "corporal punishment" or from "abuse," the same "shocks the conscience" standard applies as both claims are brought under the Fourteenth Amendment Due Process Clause.  A.B. v. Seminole County Sch. Bd., 2005 WL 2105961, at *7 (M.D. Fla. Aug. 25, 2005).

is particularly vulnerable to abuse and is otherwise defenseless. Accordingly, T.W.'s developmental disability must be considered in determining whether Garrett's actions and any resulting injury to T.W. shock the conscience. See Dockery, 167 F. Supp. 2d at 604 ("[T]he issue is better reserved for a jury—especially considering that . . . plaintiffs in this case are autistic children, who are more vulnerable and less capable of communicating than other children."); Roe ex rel. Preschooler II v. Nevada, 332 F. Supp. 2d 1331 (D. Nev. 2004) (denying motion to dismiss § 1983 claims against teacher who allegedly slapped an autistic, non-verbal child or made him slap himself, slammed the child into a chair, and made him walk from the bus to the classroom without shoes); see also Sutton v. Utah State Sch. for Deaf & Blind, 173 F.3d 1226, 1240 (10th Cir. 1999) (considering victim's severe disabilities in determining a principal's § 1983 liability for failure to implement policies to protect students from each other); cf. Fessler v. Giles County Bd. of Educ., No. 1-00-0120, 2005 WL 1868793 (M.D. Tenn. July 27, 2005). T.W., however, does not suffer from such severe disabilities as the children described in these cases. He is not "nonverbal" and has been described as "very verbal." Moreover, T.W. was clearly capable of communicating to his mother the events that were occuring at school. For example, T.W.'s mother alleges that he reported the following incidences to her: his being placed in cool down and the subsequent restraint[23]; T.W.'s reportedly claiming that he was placed in the cool down room at least ten times for

---

[23]Wilson sent a note to school the next day questioning why T.W. had been restrained and his arm twisted in the cool down room, clearly establishing that T.W. had informed her of Garrett's actions of the previous day.

the entire day[24]; T.W.'s referring to Garrett as "Megabitch"; T.W. telling his mother that Garrett called her a "slut" and a "whore"; T.W.'s complaining that Mort had confiscated a magazine which she deemed inappropriate for a school setting; and multiple other incidences where T.W. reportedly informed his mother of ongoing problems with Garrett. (Wilson Dep. at 51-52, 61, 64, 94-101). Additionally, T.W. has a history of becoming aggressive and disruptive whenever requested to complete a task that he did not want to do.

The Court now examines the alleged physical abuse of T.W in light of his developmental disabilities. Though reasonable people may disagree as to when—if ever—corporal punishment is necessary in a school setting, the record evidence establishes that the incidents of physical restraint used on T.W. by Garrett did not result in an injury arising to the conscience-shocking level. The restraints were, at least in part, in response to T.W.'s own behavior, and thus arguably either for disciplinary or safety purposes.[25] The first restraint occurred after T.W. refused to go to the cool down and was causing a disruption in the classroom. The second restraint resulted from T.W.'s refusal to stop scratching himself. When combined with T.W.'s past self-injurious behavior, the subsequent restraint was arguably for safety purposes. Another incident of restraint happened after T.W. reportedly swung at Garrett. The only allegation of physical abuse supported by evidence

_____

[24]Both Mort and Rodriguez deny that T.W. was ever locked in the cool down room for the entire day at any time, much less ten times.

[25]Though Mort and Rodriguez have testified that they believe Garrett would provoke T.W. and then use excessive and unnecessary restraint to subdue him, their testimony establishes that the incidences in which T.W. was restrained by Garrett were—at least in part—a result of T.W.'s own actions and done in either an effort to protect T.W. from self-injurious behavior or to maintain discipline in the classroom.

which did not involve either a disciplinary or safety purpose was the incident where Mort stated that she believed Garrett attempted to trip T.W. as he was exiting the cool down room; as noted earlier, however, Mort herself was not sure whether Garrett intentionally attempted to trip T.W. or merely happened to be turning around when T.W. was exiting.  (Mort Dep. July 25, 2007 at 128).

The Court next examines the relationship between need for the use of force and the amount of force administered.  Mort and Rodriguez allege that Garrett would provoke T.W. until he acted out and that she would use excessive force and improper restraint techniques in response.  However, the record is also replete with evidence that Garrett would release T.W. from restraint when he stopped the behavior that instigated the need for restraint in the first place, often lasting less than five minutes in total.  At no time did T.W. seek medical attention as a result of the force used during these incidences.  The Court does not find this factor to weigh in favor of either party.

The Court next looks to the extent of the injury inflicted.  The extent of the physical injuries inflicted from the alleged physical abuse is minimal at best.  Wilson relates seeing bruises on T.W.'s arms twice during his time in Garrett's classroom.  (Wislon Dep. at 59-60).  T.W. never received medical treatment for his injuries and did not suffer any physical scarring from the restraints.  Plaintiff argues that in addition to the bruises, T.W. suffered emotional and psychological damage as a result of Garrett's abuse.  However, while psychological abuse alone may rise to the level of a constitutional deprivation, no court has ever found a psychological injury to meet § 1983's high threshold.  See Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., 77 F.3d 1253, 1256 (10th Cir. 1996); Brown ex

rel. Brown v. Ramsey, 121 F. Supp. 2d 911, 923 (E.D. Va. 2000); see also M.M. ex rel. J.M. v. Tredyffrin/Easttown Sch. Dist., No. 06-1966, slip op., 2006 WL 2561242, at *13 (E.D. Pa. Sept. 1, 2006); S.M. ex rel. L.G. v. Lakeland Sch. Dist., 148 F. Supp. 2d 542, 547-48 (M.D. Pa. 2001). Given the minimal physical injuries inflicted upon T.W., the Court cannot find an injury that literally shocks the Court's conscience and amounts to a deprivation of T.W.'s constitutional rights.

Plaintiff also alleges that T.W. suffered emotional and psychological abuse due to his witnessing Garrett's abuse of his classmates. In a companion case, the Court held:

> In a classroom of less than ten students, all of whom are autistic, the regular use of unnecessary violence and the consistent barrage of verbal assaults could have created a harmful and perhaps emotionally abusive environment. When that environment is coupled with evidence of direct physical assault and purposeful neglect, the Court must conclude that whether a constitutional violation occurred is one for a jury. Garrett's direct abuse of one child was a different kind of abuse for another. An absurd result might follow, particularly in this setting, if Garrett's actions were considered in a vacuum and Garrett benefitted from the fact that she mistreated all of the children rather than confining her abuse to one unfortunate victim.

J.V., No. 6:04-cv-1889, Doc. 164 at 21 (M.D. Fla. filed Mar. 21, 2007). In the instant case, however, there are no allegations that Garrett purposefully neglected T.W. Additionally, the only allegations of direct physical abuse of T.W. are the restraints employed for arguably pedagogical purposes and the incident where Garrett allegedly attempted to trip T.W. as he exited the cool down room. Given the total absence of evidence of neglect and minimal physical abuse regarding T.W., this Court does not find T.W.'s alleged psychological and emotional injuries from witnessing Garrett's treatment of other students rises to the exacting "shocks the conscience" standard required by the Eleventh Circuit in § 1983 claims.

"The Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action. <u>Neal</u>, 229 F.3d at 1074. As the Court finds that T.W.'s constitutional rights have not been violated, it is unnecessary to determine whether the law was clearly established at the time of the alleged injury in order to determine the merits of Garrett's qualified immunity defense. Accordingly, Garrett's Motion for Summary Judgment (Doc. 88) is hereby granted.

<u>IV. Seminole County School Board's Motion</u>

<u>A. Section 1983</u>

"A plaintiff seeking to impose liability on a municipality (school district) under section 1983 must identify a municipal 'policy' or 'custom' that caused a deprivation of federal rights." <u>Davis ex rel. Doe v. Dekalb County Sch. Dist.</u>, 233 F.3d 1367, 1375 (11th Cir. 2000). Liability will not attach under a theory of *respondeat superior*; rather, a school board policy or custom must actually cause the deprivation of the plaintiff's constitutional rights if a school board is to be held liable for a plaintiff's constitutional injury. <u>Doe v. Faerber</u>, 446 F. Supp. 2d 1311, 1316 (M.D. Fla. 2006).

"[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004). A prerequisite to municipal liability is that the plaintiff must have suffered a constitutional violation at the hands of a government actor. <u>See</u> <u>Davis</u>, 233 F.3d at 1375. If that prerequisite fails, liability on the part of the municipality must fail as well. <u>S.M.</u>, 148 F. Supp.

2d at 551 ("Unless the plaintiff can establish that she suffered a violation of a constitutional right, 'it is irrelevant for purposes of section 1983 liability whether [the municipality's] policies, enacted with deliberate indifference, caused an injury.'" (quoting <u>Regalbuto v. City of Philadelphia</u>, 937 F. Supp. 374, 378 (E.D. Pa. 1995))); <u>Thomas</u>, 467 F. Supp. 2d at 492 ("[P]laintiffs' failure to proffer competent evidence to support a finding that [the defendant] deprived [the child] of a constitutional right forecloses their ability to establish municipal liability against these defendants for the same conduct."); <u>Boldthen v. Indep. Sch. Dist.</u>, 865 F. Supp. 1330, 1338 (D. Minn. 1994) ("[T]he lack of a constitutional violation by school officials proves fatal to Plaintiffs' claim against the school district.").  Because the Court has already concluded that T.W. has failed to establish a constitutional violation, any attempt to impose § 1983 liability on the School Board must be denied.  As to Count I, Defendant Seminole County School Board's Motion for Summary Judgment must be granted.

> ## B. 29 U.S.C. § 794 (Section 504 of the Federal Rehabilitation Act of 1973)

Title V, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  While § 504 claims typically arise in response to purely educational deprivations or concerns, the statute also applies in cases involving peer-to-peer harassment or abuse, <u>see</u> <u>Werth v. Bd. of Dirs. of Pub. Schs.</u>, 472 F. Supp. 2d 1113 (E.D. Wis. 2007), and even in cases where a teacher has abused or harassed a student, <u>see</u> <u>Witte v. Clark County Sch. Dist.</u>, 197 F.3d 1271 (9th Cir. 1999); <u>Charlie F. ex rel. Neil F. v. Bd. of Educ.</u>, 98 F.3d 989 (7th Cir. 1996); <u>Bowden ex</u>

rel. Bowden v. Dever, No. 00-12308-DPW, 2002 WL 472293 (D. Mass. Mar. 20, 2002); Kubistal v. Hirsch, No. 98-C-3838, 1999 WL 90625 (N.D. Ill. Feb. 9, 1999), when that harassment results in an educational injury or deprivation.

To establish a § 504 violation, "a plaintiff must prove that (1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 253 (3d Cir. 1999) (citing W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995)). Plaintiff's § 504 claim (Count II) must fail for the same reasons as does the § 1983 substantive due process claim. Plaintiff has offered no evidence to support a claim that T.W. was intentionally discriminated against on the basis of his disability and Plaintiff is not permitted to rest on mere allegations and speculation when faced with a properly supported motion for summary judgment. As to Count II, Defendant Seminole County School Board's Motion for Summary Judgment is granted.

### C. Negligent Hiring, Supervision, and Retention

Having dismissed T.W.'s federal claims, the Court declines to exercise supplemental jurisdiction over the state law claim. See 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction when claims giving rise to original jurisdiction have been dismissed). Accordingly, T.W.'s state law claim (Count III) is hereby dismissed without prejudice.

### V. Conclusion

In accordance with the foregoing discussion, it is hereby **ORDERED** as followed:

1.  Defendant Garrett's Motion for Summary Judgment (Doc. 88) is **GRANTED**.

2.  Defendant Seminole County School Board's Motion for Summary Judgment (Doc. 83) is **GRANTED IN PART** and **DENIED IN PART**.  Summary Judgment is **GRANTED** as to Count I and Count II and **DENIED** without prejudice as to Count III.

3.  Pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over the remaining state law claim in Count III.  Accordingly, the claim is **DISMISSED WITHOUT PREJUDICE** to refile it in state court.  As set forth in 28 U.S.C. § 1367(d), the period of limitations for this claim is tolled "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

4.  All other pending motions are **DENIED as MOOT**.

5.  The Clerk is directed to enter a judgment providing that Plaintiff shall take nothing from Defendants on Counts I, II, or IV.  Thereafter, the clerk shall close this file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 28th day of April, 2009.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party